HERGET, Judge.
On July 31, 1959 plaintiff-appellee, Robert L. Dedon, Jr., an employee of Braswell Motor Freight Lines, went to the premises of Grant Chemical Company in Baton Rouge, Louisiana to load a cargo of 55 barrels of latex into his semi-trailer to be delivered to Esson Standard Oil Company. He was assisted in loading his trailer by a Mr. Santo A. Calandro, an employee of the Grant Chemical Company, and they completed the loading of his truck in approximately one hour’s time, at which time Dedon testified he entered the warehouse building of the defendant, Grant Chemical Company, Inc., to determine whether he was to pick up a bill of lading there or at the consignee’s address. He was accompanied into the building by Mr. Calandro and, it being a hot, sultry day, as Messrs. Dedon and Calandro entered the building Plaintiff testified he inquired of two employees of Defendant Company as to where he might obtain a drink of water and they pointed to an electric refrigerator located in the rear of the premises. Together Mr. Calandro and Plaintiff went to the refrigerator and removed therefrom two jars or gallon jugs, the one from which Mr. Calandro drank being filled with water and the one from which Mr. Dedon drank being partially filled with a chemical known as Methyl-Ethyl-Ketone peroxide. The jugs were similar in every respect with the exception that the jug from which Plaintiff drank the content was a brown stained glass whereas the one from which Calandro drank was clear glass. Upon removing the brown jug Plaintiff commented to Mr. Calandro “ * * * I said we will finish this one up so it can be refilled which the other two jugs were completely full.” Plaintiff obtained a Dixie cup from a stack on top of the refrigerator, poured the content from the brown jug into it and drank same. The jug from which he drank actually contained a chemical which is a catalytic agent known as MEK peroxide, a clear, malodorous liquid which was used by Defendant Company in order to change *760 certain liquids into solids. This chemical must be kept refrigerated to preserve its composition and viscosity. In addition to the chemical and water kept in the refrigerator (a refrigerator similar in every respect to an ordinary refrigerator customarily used in homes) there were Coca-Colas and 7-Ups. The ingestion of this chemical is dangerous and harmful when it comes in contact with the mucous membrane. As a result of the accident Plaintiff sustained injuries which resulted in his bringing this suit and from a judgment in his favor and against both Defendants jointly and in solido in the sum of $10,725.-15 Defendants suspensively appealed to this Court.
Defendants maintain in this Court that the Trial Court erred in holding that the Plaintiff was an invitee of the Defendant Company at the time he consumed the chemical; in holding that the Defendant was negligent in failing to warn Plaintiff of the chemical; in holding that Plaintiff was not contributorily negligent in failing to observe the label on the jug; the viscosity or odor of the chemical while in the chemical plant; in holding that the Plaintiff had continued to suffer the effects of the chemical until the day of the trial or that his continued suffering, if such, was proximately caused by the accident.
Though employees of the Defendant Company testified that the bill of lading which Plaintiff maintains he entered the premises to obtain was to be picked up at the point of destination rather than at the Defendant’s plant and therefore Plaintiff had no business in the premises of the Defendant Company and certainly was not a business invitee, Plaintiff’s testimony that he entered the building with the intention of obtaining or inquiring about the bill of lading is uncontroverted, so despite the fact that he momentarily deviated from his expressed pursuit to obtain a drink of water does not have the effect of changing his status as a business invitee. “ * * * A person who goes upon premises for business purposes is not deprived of the right to protection against defects by the fact that at the moment of the injury he was not engaged in the business for which he came, but was pursuing a purpose of his own, provided he was pursuing it upon a part of the premises covered by the invitation, * * 38 Am.Jur., § 99, page 760.
 Defendants relying upon the cases of Vargas v. Blue Seal Bottling Works, Ltd., 12 La.App. 652, 126 So. 707 and Thomas v. Buquet and LeBlanc, Inc., et al., La.App., 119 So.2d 129, maintained that the Plaintiff lost his status as an invitee and became a licensee when he went to the refrigerator for the water. Both of these cases are distinguishable from the facts of this case for in the cited cases Plaintiffs had completed their missions on the premises and remained for personal reasons. In the Thomas case, the Plaintiff actually had gone to a portion of the premises which was not included in the invitation. We observe, however, that under the facts of this case it makes no difference whether Plaintiff was actually an invitee or a licensee for, while concededly an invitee is owed a greater duty, the occupier of premises owes a duty to a licensee to warn him of danger if it is known to the occupier of the premises. Alexander v. General Accident Fire and Life Assurance Corporation, La.App., 98 So.2d 730. According to the testimony of the Defendants all of the employees of the company were aware of the fact that this chemical was stored in the refrigerator along with the drinking water and cold soft drinks. We are firmly of the opinion that the warning, if any, which Plaintiff received as to the presence of the chemical in the container from which he imbibed was inadequate. Under the circumstances there was nothing to suggest to him that stored in the refrigerator along with the drinking water, Coca-Colas and 7-Ups would be this chemical, for in actuality the placing of this chemical in the same refrigerator along with the drinking water and soft drinks would lull one into a false sense of security in believing that the *761 contents of containers in the refrigerator were for the purpose of quenching one’s thirst. Defendants contend that Plaintiff did not act as a reasonable man in that he failed to observe a label pronouncing its content allegedly pasted on the jug from which he imbibed; and further, that he failed to observe the fact that the liquid which he drank was thicker than water and had a peculiar odor. Though there was offered in evidence a sample of the chemical which had been unrefrigerated and which, upon observation by this Court, was thicker than water and did have a peculiar odor, it is to be noted that the chemical Plaintiff imbibed was under refrigeration which maintained its viscosity and no doubt reduced its odor. Therefore, in view of the factual showing that Plaintiff had been directed to the refrigerator by an employee of the Defendant Company in response to his query -of obtaining drinking water; that another employee of Defendant at the same time did in truth drink water from another container similar to that from which Plaintiff drank; that Plaintiff when pouring the liquid from the bottle remarked to the employee of the Defendant Company the bottle was low in content and he would finish it so it could be refilled; that the employee of Defendant at that time gave no warning to Plaintiff of the content of the bottle, in our opinion makes understandable the reason Plaintiff, on this hot day, was unaware that he was consuming a dangerous chemical. Though the jug from which he poured and drank the content was labeled, there was no evidence that the label was turned toward Plaintiff when he poured its content and drank same. Concededly, if Plaintiff had entered the premises of Defendant Chemical Company’s plant unaccompanied and unassisted in quest of water, had located a refrigerator in the premises and a jug therein, it would appear that prior to partaking of the substance from any container found therein Plaintiff would have made minute observation to ascertain its content. However, in the light of the circumstances under which this accident occurred, this observation fades into thin air, when Plaintiff, an invitee, entered the refrigerator in response to his query made to an employee of Defendant Company as to obtaining a drink of water and even at the time of partaking of the liquid from the jug he was accompanied by another employee of Defendant Company who failed to warn Plaintiff specifically of the presence of the chemical in the bottle from which he poured the substance, such actions were calculated to remove from Plaintiff’s mind any thought or suggestion that the content of the bottle was anything other than water. Plaintiff was lulled into a false sense of security and, understandably, did not make minute observation of the label on the bottle of its content or make special note of an odor. It was a hot day, he was thirsty, the air in the chemical plant was permeated with extraordinary odors and with the omission of a warning of the dangerous potentialities of the liquid, Plaintiff undoubtedly had reason to believe that it was only thirst-quenching water. Accordingly, we are of the opinion that Plaintiff was guilty of no negligence contributing to the accident thereby barring his right to recover, but that the sole cause of this accident was the storing of this chemical in a refrigerator along with drinking water and bottled soft drinks, and in the failure of the Defendant Company to specifically warn Plaintiff, an invitee, of the presence of the chemical in the refrigerator. We are of the opinion that Plaintiff, an invitee of the Defendant, was owed the duty of reasonable and ordinary care and the placing of this chemical in the refrigerator along with the drinking water and soft drinks created a dangerous condition which required either correction or a specific warning of the potential danger. Alexander v. General Accident Fire and Life Assurance Corporation, supra; Spurlock v. Boyce-Harvey Machinery, Inc., La. App., 90 So.2d 417; Dyer v. Stephens Buick Company, La.App., 125 So.2d 185.
In consequence of drinking the chemical Plaintiff sustained severe injuries. Following the accident he was taken to the hospital, *762 administered medication to induce vomiting and stayed in the emergency room at the hospital violently vomiting for about an hour ultimately vomiting blood. At that time effort was made by members of the hospital staff to determine the proper medication to counteract the poisonous chemical substance which Mr. Dedon had consumed. The mucous membrane of Plaintiffs throat was swollen and he experienced difficulty in breathing and had to be placed under oxygen for two days. It was necessary to feed him intravenously for a period of approximately eight days. Because of the damage to his throat and esophagus he was given numerous antibiotics by injection rather than orally. He suffered excruciating pain, for the relief of which he was given numerous injections of sedation. Following the intravenous feeding, Plaintiff was, at the end of eight days, able to drink soup and at the end of eleven days he was discharged from the hospital to partake of Cream of Wheat. For three months thereafter he was unable to eat any solid foods. Plaintiff received treatment from Dr. Robert R. Matthews, a general practitioner associated with the Rieger Clinic, until his discharge in December of 1959 when he was advised that he would continue to have gastric disturbances as a result of the injuries for some time and he was also advised that he was left with a "nervous stomach”. During the course of treatment it became necessary to readmit Plaintiff to the hospital where he was esophagoscoped, a very painful procedure in which a tube is run through the mouth down the throat to the stomach for the purpose of determining whether there had been any closure of the esophagus. Though there had originally been ulceration of the esophagus, it was determined that there was no closure of the esophagus. Dr. Gerald Joseph, an ear, nose and throat specialist, was called in by Dr. Matthews two days after the accident, at that time Dr. Joseph testified that because of the tenderness of the area he was unable to properly examine Plaintiff’s esophagus initially beyond the area of the throat and for that reason he was-rehospitalized.
Subsequent to his discharge by Rieger Clinic in 1959 Plaintiff did not seek medical advice for his injuries until September,. 1960 when he returned to Dr. Matthews complaining of uncontrollable gastric disturbances making it impossible for him to eat many foods without difficulty. Additional tests were run and it was concluded that the lower part of Plaintiff’s esophagus did not function properly causing gastric acid in the stomach to back up into the lower part of the esophagus and, in addition, his condition was diagnosed as pylorospasm with spasticity of the duodenal bulb which, in lay terms, Dr. Matthews explained was a “preulcer”.
Defendants maintain that Plaintiff’s stomach condition was not related to the consumption of the chemical because of the fact the induced vomiting and some suspected vomiting previous to his having reached the hospital would have prevented the chemical from reaching the stomach. However, Dr. Matthews testified that in his opinion there was a definite causation and connection between the accident and the condition of the stomach and the esophagus-Though Dr. Matthews was of the opinion that probably the pylorospasm was psychosomatic, nevertheless he was of the opinion that it was the accident which caused the embalance in the nervous system resulting in Plaintiff’s complaints at the time of the trial.
Admittedly, the fixation of an award for damages for personal injuries sustained cannot be measured by a yardstick nor accurately nor mathematically calculated, but to some degree must result from the exercise of vested discretion, observation of the injured person, and to some extent an arbitrary determination of a monetary award compensable with the injuries sustained. In fixing the damages suffered by Plaintiff as a result of this accident, the Trial Judge awarded judgment in his favor *763 against the Defendants jointly and in solido in the sum of $9,500 plus the special damages sustained, or a total of $10,725.15. To the extent that a monetary award may compensate Plaintiff for the injuries sustained by him, we feel that this judgment is fair, being neither excessive nor minimal and, accordingly,
For the reasons assigned, the judgment of the Lower Court is affirmed at Appellants’ costs.
Affirmed.